**STROEHMANN BAKERIES, INC., Appellee,**

v.

**LOCAL 776, INTERNATIONAL BROTHERHOOD of TEAMSTERS, Appellant.**

No. 91–5261.

United States Court of Appeals, Third Circuit.

Argued Sept. 20, 1991.

Decided June 29, 1992.

Ira H. Weinstock (argued), Law Office of Ira H. Weinstock, Harrisburg, Pa., for appellant.

Steven R. Wall (argued), Timothy P. O'Reilly, Catherine Reid, Morgan, Lewis & Bockius, Philadelphia, Pa., for appellee.

Robert E. Williams, Douglas S. McDowell, Ann Elizabeth Reesman, McGuiness & Williams, Washington, D.C., for amicus curiae Equal Employment Advisory Council.

Present: BECKER, HUTCHINSON and SCIRICA, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

Local 776 International Brotherhood of Teamsters (the Union), appeals an order of the United States District Court for the Middle District of Pennsylvania granting Stroehmann Bakeries, Incorporated (Stroehmann's) motion for summary judgment, denying the Union's cross-motion for summary judgment, vacating labor arbitrator John Sands' (Arbitrator Sands) award reinstating Samuel Leonard (Leonard), a former Stroehmann employee, with full back pay, and remanding the matter for a *de novo* hearing before a different arbitrator. *See Stroehmann Bakeries, Inc. v. Local 777 Int'l Brotherhood of Teamsters,* 762 F.Supp. 1187, 1190 (M.D.Pa.1991). Pursuant to a work rule, Stroehmann discharged Leonard for "immoral conduct" after a customer reported him for sexual

harassment. Arbitrator Sands concluded Stroehmann had not given Leonard a full *opportunity* to refute the charge or explain his conduct and so reinstated him without deciding whether the charge of sexual harassment was true. *See id.* at 1188–90. The issues on appeal are whether the district court properly concluded that the arbitrator's award violated public policy and, if so, whether it properly vacated the award and remanded the matter to a different arbitrator.

 We will affirm. Under the circumstances present here, an arbitrator's award reinstating an employee accused of sexual harassment without a determination regarding the merits of the allegation violates well-established and dominant public policies concerning sexual harassment in the workplace. Moreover, because Arbitrator Sands demonstrated an unacceptable predisposition towards Leonard and against Stroehmann, the district court did not abuse its discretion in ordering that another arbitrator should be appointed to conduct a *de novo* hearing on the merits of the allegations against Leonard.

### I.

On July 18, 1990, Stroehmann filed a complaint against the Union in the United States District Court for the Middle District of Pennsylvania. Stroehmann sought to vacate an award issued by Arbitrator Sands reinstating Leonard, a former Stroehmann employee. Stroehmann discharged Leonard after investigating and determining that he had sexually harassed a customer's employee. This conduct violated a company rule that prohibited immoral conduct while on duty. Stroehmann's complaint asserted that the award should be vacated because it violated a well-defined public policy against sexual harassment in the workplace.

On August 17, 1990, the Union filed an answer and a counterclaim. The counterclaim sought enforcement of the arbitration award.

On December 20, 1990, Stroehmann moved for summary judgment on its complaint and on the Union's counterclaim.

The Union filed a cross motion for summary judgment on January 7, 1991 on all claims raised by both parties.

By order entered March 18, 1991, the district court granted Stroehmann's motion for summary judgment, denied the Union's cross-motion, vacated the arbitration award and remanded the matter for a *de novo* hearing before a different arbitrator. *Id.* at 1190. On April 4, 1991, the Union filed a timely notice of appeal from that order.

### II.

Stroehmann employed Leonard as a "store door" driver for about seventeen years. As a "store door" driver, Leonard was to deliver bread products to Stroehmann's customers, usually between the hours of 8:00 p.m. and 9:00 a.m. On November 20, 1989, Stroehmann discharged Leonard for violating a company rule prohibiting immoral conduct while on duty.

The following events led to the discharge. On November 14, 1989, Ken Zimmerman (Zimmerman), the manager of Stauffer's, a Stroehmann customer store in Lititz, Pennsylvania, telephoned Bill Burns, a Stroehmann Key Account Manager, and said that he needed to speak with Steve Garrett (Garrett), Stroehmann's Harrisport Sales Activator, immediately. Garrett and Joe Jacobs (Jacobs), Stroehmann's Harrisport Branch Manager, returned Zimmerman's call later that day. Over the phone, Zimmerman told Garrett and Jacobs that a Stauffer night clerk, Kimberly Wiegand (Wiegand), told her mother that Leonard had sexually harassed her by touching one of her breasts without her consent, pushing himself against her and making explicit sexually charged remarks that were offensive to her while delivering bread to the store on November 12, 1989. Zimmerman learned of the alleged incident through a phone call from Wiegand's mother. Zimmerman said that, as a result of the alleged incident, he no longer wanted Leonard to deliver bread to Stauffer's.

Garrett and Jacobs telephoned Wiegand the same day. The two discussed the alleged incident with Wiegand over a speaker

phone. They prepared a report of this conversation, which Wiegand signed two months later. According to the report, after Wiegand let Leonard into the closed store to make a delivery, he told her that he had just had a conversation on his citizen's band radio with two girls about an orgy and that he was excited about the conversation. Wiegand then asked Leonard if he was married. He said that he was. Leonard then added that he had engaged in extramarital sexual intercourse in the past, but that presently he just wanted to feel other women because he was afraid of contracting AIDS. After unloading his delivery, Leonard picked up an orange and asked Wiegand if her breasts were hard like the orange. Leonard attempted to pull up Wiegand's shirt and she resisted. At that point, Wiegand walked to the front of the store to see if the other night employee had arrived and Leonard followed her. When she discovered that the other employee had not yet arrived, Wiegand began walking to the back of the store. Leonard was then in front of Wiegand and told her he knew she was following him so she could "look at [his] ass." Appendix (App.) at 124. Wiegand replied that she was following him in order to let him out of the store and make sure that the door was locked behind him. Then, Leonard moved behind Wiegand and reached around her and grabbed her breasts. She resisted and held the door open for Leonard to leave. Leonard asked if Wiegand was trying to get rid of him, and then told her not to tell her father about the incident because he did not want to jeopardize his friendship with her father. Leonard then left and Wiegand locked the door. Garrett and Jacobs observed that Wiegand was emotionally upset and sobbed during their conversation.

The following day, November 15, 1989, Jacobs telephoned Leonard and asked him to come in to discuss a problem. Leonard asked if he should bring a Union representative and Jacobs told him it was up to him. Leonard arrived at Jacob's office alone. Jacobs, Garrett and Paul Blair (Blair), Leonard's supervisor, presented Leonard with Zimmerman and Wiegand's comments. Jacobs said Leonard denied the allegations, stated that Wiegand was "wacko", and that he would not have done something to jeopardize his marriage. App. at 126. Leonard signed a written statement that Jacobs prepared documenting these responses. He also stated that the allegation concerning the citizen's band radio must have been a lie because his was broken. This comment was not included in the written statement. Although Leonard invited the men to come outside and observe the broken radio, they did not do so. On the written statement Jacobs wrote that Leonard was suspended pending further investigation of the alleged incident.

Jacobs discussed the matter with his superiors and Stroehmann's attorney over the next few days. He also met with Zimmerman on November 17, 1989 to again discuss the matter with him.

On November 20, 1989, Jacobs telephoned Leonard and informed him that he was discharged for violation of a company rule prohibiting immoral conduct while on duty. Immoral conduct is considered a "major offense" which subjects the offender to immediate discharge under longstanding written Stroehmann policy. At that time, Leonard told Jacobs that Wiegand had made unreciprocated sexual advances towards him and that he had rejected them.

Leonard filed a grievance over the discharge pursuant to the Collective Bargaining Agreement (Agreement) between Stroehmann and the Union.[1] In the Agreement, Stroehmann promised it would "exercise the power of discipline and discharge fairly and with regard for the reasonable rights of the employees." App. at 10. The Agreement went on to say "[a]ny employee

---

1. The Agreement was effective from November 13, 1986 to November 12, 1989. While the alleged harassment occurred on November 12, 1989, the resulting discipline, discharge and arbitration hearing which are the subject of this case did not occur until after that date. Since neither party has raised any issue about the applicability of the Agreement to this case, we will assume the Agreement and its grievance procedure were renewed or continued without material change.

who has been disciplined or discharged for any reason shall have the right to a hearing under the grievance and arbitration provisions" of the Agreement. *Id.*

Leonard's grievance went to arbitration and an arbitration hearing was held on March 29, 1990 on the question; Was there just cause for Leonard's discharge, and if not, what shall the remedy be? The arbitrator expressly refused to find whether the alleged sexual harassment occurred. Instead, he found that Stroehmann had insufficiently investigated the alleged incident before discharging Leonard. Based solely on this finding, he determined that Leonard was not discharged for just cause and ordered his reinstatement with full back pay less interim earnings.

The arbitrator did not reach a conclusion concerning the evidence before him, or the credibility of the witnesses.[2] Nevertheless, he stated that if he had to make a factual determination regarding the occurrence of the incident, he would have to find in favor of Leonard because he had insufficient evidence to determine whether Leonard or Wiegand was more credible.

The district court vacated the award after concluding that there exists a well-established public policy against sexual harassment in the workplace and that the arbitrator's award violated that public policy by ordering reinstatement without a factual finding on the merits of the allegations against Leonard. The district court further remanded the matter for arbitration before a different arbitrator because it also concluded that arbitrator Sands had demonstrated a clear pre-disposition in Leonard's favor and an insensitivity to sexual harassment claims. The district court reached the last conclusion based on its determina-

tion that the arbitrator emphasized such irrelevant matters as the alleged victim's social life and appearance and Leonard's marital status, expressed his personal opinions about Stroehmann's sensitivity to sexual matters and ignored Leonard's testimony that he told Wiegand he wished his wife's breasts were hard like an orange.

## III.

The district court had subject matter jurisdiction over this case pursuant to Section 301(a) of the National Labor Relations Act. *See* 29 U.S.C.A. § 185(a) (West 1978). Section 301(a) gives federal district courts jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter ... in any district court of the United States having jurisdiction of the parties." The district court also had federal question jurisdiction. *See* 28 U.S.C.A. § 1331 (West Supp.1991).

We have appellate jurisdiction over this appeal from the final order of the district court granting summary judgment to Stroehmann pursuant to 28 U.S.C.A. § 1291 (West Supp.1991). Although an order denying a motion for summary judgment is not ordinarily final and appealable under section 1291, it becomes so when accompanied by an order granting a cross-motion for summary judgment. *Nazay v. Miller,* 949 F.2d 1323, 1328 (3d Cir.1991). Therefore, we also have appellate jurisdiction over the district court's order denying the Union's cross-motion.

We exercise plenary review over this appeal from an order resolving cross-motions for summary judgment. *Interna-*

---

**2.** In the paragraph introducing his conclusions, the arbitrator states: "On the entire record before me, including my assessments of witnesses' credibility and the probative value of the evidence, I must sustain Leonard's grievance...." App. at 38. This statement cannot be construed to mean that the arbitrator fully considered the evidence and testimonial credibility of the witnesses for the purpose of making a determination on the merits of the allegations against Leonard because the very next sentences emphasize the opposite. They state: "First, it is

essential at the outset to eliminate what this decision does *not* involve. It does *not* involve any fine questions of quantum of proof, relative credibility of witnesses, seriousness of charged misconduct, or presence of anti-union animus." App. at 38 (emphasis in original). In addition, the substance of the opinion, read as a whole, strongly indicates that the arbitrator did not consider either the evidence or the witnesses' credibility and so could not have made an impartial merits determination.

*tional Union, United Mine Workers of Am. v. Racho Trucking Co.,* 897 F.2d 1248, 1252 (3d Cir.1990). Therefore, we apply the same test the district court applied: (1) are there no material facts in dispute; and (2) is one party entitled to judgment as a matter of law? *See* Fed.R.Civ.P. 56(c); *Racho Trucking,* 897 F.2d at 1252.

## IV.

The Union argues that the district court erred in the following ways: it determined the means used to reach the award, and not the award itself, violated public policy; it minimized industrial due process concerns, and it incorrectly portrayed the arbitrator as insensitive to sexual harassment claimants, and so biased towards Leonard and against Stroehmann. Thus, the Union seeks reversal of the district court's order because courts cannot vacate a labor arbitration award unless the award itself, not just the means of arriving at it, violates public policy.

 It is well settled that courts generally have only a very limited power to review a labor arbitration award by an arbitrator appointed pursuant to a collective bargaining agreement. *See United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 37, 38, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987); *W.R. Grace & Co. v. Local 759, International Union of United Rubber Workers,* 461 U.S. 757, 764, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983); *United Steelworkers of Am. v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 596, 598–99, 80 S.Ct. 1358, 1360, 1361–62, 4 L.Ed.2d 1424 (1960). If it were otherwise, the Congressional objective of settling labor disputes by arbitrators expert in industrial practices and customs would be undermined. *See Enterprise Wheel,* 363 U.S. at 596, 80 S.Ct. at 1360. Full-blown judicial review of labor arbitrators' decisions would likewise annul the bargain of the parties for an arbitrator's construction of their collective bargaining agreement instead of a court's. *Id.* at 599, 80 S.Ct. at 1362. Broad court review would render the arbitrator's decision practically meaningless, as it would almost never be final. *Id.* There-

fore, as long as the arbitrator's award is drawn from the essence of the collective bargaining agreement, a court may not vacate it even if the court finds the basis for it to be ambiguous or disagrees with its conclusions under the law. *Id.* at 597–98, 80 S.Ct. at 1361.

 Nevertheless, there are exceptional situations in which courts do review the merits of labor arbitration awards. One such situation is based on the general principle that courts may not enforce contracts which are contrary to public policy. *See Grace,* 461 U.S. at 766, 103 S.Ct. at 2183. Since collective bargaining agreements are contracts, courts may not enforce them in a manner that is contrary to public policy. Accordingly, if an arbitrator construes a collective bargaining agreement in a way that violates public policy, an award based on that construction may be vacated by a court. *See id.*

 This exception, though, does not give courts broad discretion to vacate arbitration awards based on general considerations of supposed public policy. *See Misco,* 108 S.Ct. at 373. Courts may only vacate arbitration awards which explicitly conflict with well-defined, dominant public policy. *Id.* A public policy is well-defined and dominant if it may be ascertained from law and legal precedent. *Id.*

There is a well-defined and dominant public policy concerning sexual harassment in the workplace which can be ascertained by reference to law and legal precedent. Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–2(a)(1) (West 1981), prohibits employment discrimination on the basis of sex. The Supreme Court of the United States has interpreted this prohibition to include sexual harassment in the workplace which has either an economic effect on the complainant, or creates a hostile or offensive work environment. *See Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 64–67, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986). The Equal Employment Opportunity Commission (EEOC) has promulgated a regulation that elaborates what

constitutes sexual harassment under Title VII:

> Harassment on the basis of sex is a violation of [42 U.S.C.A. § 2000e–2(a)(1)]. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

29 C.F.R. § 1604.11(a) (1991) (footnote omitted). In further explanation, the EEOC has published this Guideline:

> [U]nwelcome, intentional touching of a charging party's intimate body areas is sufficiently offensive to alter the conditions of her working environment and constitute a violation of Title VII. More so than in the case of verbal advances or remarks, a single unwelcome physical advance can seriously poison the victim's working environment.

EEOC Policy Guidance: Sexual Harassment, N–915.035, *quoted in Newsday, Inc. v. Long Island Typographical Union, No. 915,* 915 F.2d 840, 844 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1314, 113 L.Ed.2d 247 (1991). It is clear that there is a well-defined, dominant public policy against sexual harassment in the workplace and that behavior such as that alleged by Wiegand is considered sexual harassment under the law.

In addition to the public policy against sexual harassment in the workplace, a well-defined, dominant public policy favoring voluntary employer prevention and application of sanctions against sexual harassment in the workplace exists. The Supreme Court recognized this important public policy in both *Grace* and *Misco.* *See Misco,* 108 S.Ct. at 373; *Grace,* 461 U.S. at 770–71, 103 S.Ct. at 2185–86. An EEOC regulation on the matter states:

> Prevention is the best tool for the elimination of sexual harassment. An employer should take all the steps necessary to prevent sexual harassment from occurring, such as affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment under Title VII, and developing methods to sensitize all concerned.

29 C.F.R. § 1604.11(f) (1991). The Guidelines further provide that employers should create a procedure to encourage alleged sexual harassment victims to come forward and seek to resolve their complaints. *EEOC Policy Guidance, supra* at N:4028, *quoted in Newsday,* 915 F.2d at 845. Stroehmann's actions following Wiegand's allegations observed and advanced this public policy.[3]

Under the circumstances present here, an award which fully reinstates an employee accused of sexual harassment without a determination that the harassment did not occur violates public policy. Therefore, Arbitrator Sands construed the Agreement between the parties in a manner that conflicts with the well-defined and dominant public policy concerning sexual harassment in the workplace and its prevention. His award would allow a person who may have committed sexual harassment to continue in the workplace without a determination of whether sexual harassment occurred. Certainly, it does not discourage sexual harassment. Instead, it undermines the employer's ability to fulfill its obligation to prevent and sanction sexual harassment in the workplace. For these reasons, we conclude that reinstatement of this employee without a determination of the merits of the allegation violates public policy.

Both the United States Courts of Appeal for the Second and Tenth Circuits have reviewed arbitration awards reinstating

---

**3.** In addition to the pertinent federal law cited, the Commonwealth of Pennsylvania has enacted a similar law. *See* Pennsylvania Human Relations Act, 43 Pa.Cons.Stat.Ann. § 955(a) (1991).

employees discharged for sexual harassment. Nothing in those opinions counsels against our holding today. Indeed, they support it.

In *Newsday*, 915 F.2d at 843, the arbitrator reinstated an employee after finding that he had committed sexual harassment more than once. The arbitrator had decided that the medicine of discipline should be administered in progressively more severe doses and discharge was too strong a dose for this stage of the employee's disease. The Second Circuit overturned the award as violative of public policy under *Misco* because it returned a known sexual harasser to the workplace, so perpetuating a hostile and offensive work environment and inhibiting the employer from performing its duty to prevent sexual harassment. *See id.* at 843–45.

In *Communication Workers v. Southeastern Elec. Coop.*, 882 F.2d 467, 468 (10th Cir.1989), however, the court refused to vacate an arbitrator's award reinstating an employee discharged for sexual harassment. There, the arbitrator concluded that the discharged employee had committed sexual harassment only one time, but was penitent and apologetic about it, and his record was otherwise unblemished. *Id.* at 468–69. He therefore concluded that suspension without pay, not discharge, was the appropriate discipline. The court expressly noted that the arbitrator had incorporated the public policy against sexual harassment into his reasoning in reaching his decision. *Id.* at 469. It decided to uphold the award in deference to arbitration decisions in labor cases, despite recognizing the public policy exception to court review of labor arbitration awards and the well-defined and dominant public policy concerning sexual harassment in the workplace. Under *Enterprise Wheel*, that principle of deference is especially strong with respect to an arbitrator's formulation of remedies. *See id.* at 470 (quoting *Enterprise Wheel*, 363 U.S. at 597, 80 S.Ct. at 1361). The arbitrator in *Communication Workers* determined the merits of the charge after full consideration of the evidence and the credibility of the witnesses before him and did impose some discipline on the employee. *Communication Workers* does not stand for the proposition that objectively unwelcome sexual advances can be ignored by a labor arbitrator. The Tenth Circuit merely deferred to the arbitrator's choice of remedy.[4]

Arbitrator Sands studiously avoided the charges against Leonard and did none of the things the arbitrator did in *Communication Workers*. Arbitrator Sands did not consider either the evidence or the credibility of the witnesses before him. He did not make a finding on the merits of the sexual harassment allegation, and he neither considered nor respected the pertinent public policy.

The dissent claims we misapprehend the arbitrator's decision. The dissent says:

His opinion explicitly suggested that there was not a sufficient basis to believe Kimberly Wiegand's allegations: 'If Stroehmann's investigation had been at all consistent with the severity of Wiegand's accusations and of their consequences for Leonard's life *and* if that investigation had provided an *adequate basis* to believe that Leonard had behaved as charged, Stroehmann's discharge decision would have been unassailable.' (emphasis added). In finding that Stroehmann's discharge decision would have been unassailable had it had an adequate basis, the arbitrator implicitly held that there was an inadequate basis for the charge of sexual harassment.

Dissent at 1448. The dissent is wrong. In reaching its conclusion regarding the scope of the arbitrator's decision it fails to mention the sentences immediately preceding and the paragraph subsequent to the language it quotes. The preceding sentences state: "First, it is essential at the outset to eliminate what the decision does *not* in-

---

4. *See also Chrysler Motors Corp. v. Allied Industrial Workers,* 959 F.2d 685 (7th Cir.1992) (an arbitrator's decision to reinstate an employee discharged for sexual harassment after finding that he had committed sexual harassment, but that he could be rehabilitated, and therefore that a less severe punishment was appropriate, does not violate public policy).

volve. It does not involve any fine questions of quantum of proof, relative credibility of witnesses, seriousness of charged misconduct, or presence of anti-union animus." App. at 38. (emphasis in original). The subsequent paragraph states in relevant part: "Second, what *is* involved in this case is the absolute insufficiency of Stroehmann's response to the information its management received on November 14th from Zimmerman and Wiegand." App. at 39 (emphasis in original).[5]

Arbitrator Sands' interpretation of the Agreement's clause relating to industrial due process neither considered nor respected public policy. Instead, his interpretation violated it.

The district court did not exceed its narrow power to review an arbitrator's findings of fact or his interpretation of the meaning of this collective bargaining agreement's provisions. Moreover, the district court did not substitute judicial opinion for an arbitrator's decision in contravention of the parties' Agreement. The district court did not rule on either the merits of the allegations or impose the remedy it thought appropriate. Instead, it simply vacated the award as violative of public policy and remanded the matter for a redetermination in light of that public policy.

The Union misunderstands the rationale for the district court's holding when it argues that the court improperly found the means used to reach the award, and not the award itself violated public policy. The district court held that the award itself violated public policy because the award would have reinstated Leonard without determining the merits of the allegations against him. That holding is proper because an award of full reinstatement without findings on what Leonard did violates the strong public policy against prevention

of sexual harassment in the workplace. The Union's first argument lacks merit.

▮ The Union's next argument that the district court did not give enough weight to industrial due process concerns is also meritless. When arbitrators interpret collective bargaining agreements containing broad clauses that require employers to follow fair procedure before disciplining employees, they consistently give meaning to those clauses by applying the concept called "industrial due process." *See Chauffeurs Local Union No. 878 v. Coca-Cola Bottling Co.*, 613 F.2d 716, 719 (8th Cir.), *cert. denied*, 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 847 (1980). Though the concept of industrial due process is not easy to define exhaustively, its use is standard practice in interpreting general provisions in collective bargaining agreements that require fair discipline procedures.[6] *See id.* at 720. Generally, in applying industrial due process to particular cases, labor arbitrators insist on similar punishments for similar offenses and require employers to give employees advance notice and an opportunity to respond to the charges against them before discipline is imposed. *See, e.g., id.* at 720 (*citing* Getman, *Labor Arbitration and Dispute Resolution*, 88 Yale L.J. 916, 921 (1979)). Arbitrators also hold that if the employee was not given an opportunity to respond, or key witness were not present to testify at the arbitration hearing, industrial due process has been violated. *Id.* at 720 n. 2 (*citing* Jennings and Wolters, *Discharge Cases Reconsidered*, 31 Arb.J. 164, 178 (1976)). We recognize the importance of industrial due process in the workplace and in the day-to-day administration of the labor contracts there, but nothing the Union has presented to us, nor that we have discovered through our own research demonstrates that Stroehmann did not respect it.

---

**5.** For the reasons set out above, we do not think Stroehmann's response was "absolutely" insufficient given the nature of the charges. *See* pp. 1445–46.

**6.** Some examples of provisions that trigger analysis in terms of industrial due process are

clauses which merely state the discipline must be for "just cause," *see, e.g., Chauffeurs,* 613 F.2d at 718, or, as the Agreement between the Union and Stroehmann, merely state that the employer must be "fair and reasonable," *see* App. at 10.

Stroehmann gave Leonard a chance to respond to the charges against him; Leonard had notice that the conduct charged could result in discharge; Leonard was informed of the source of the charge against him; and Jacobs told Leonard that he could bring Union representatives to the meeting in which he was first confronted with the charges against him, but he chose not to do so. Additionally, Stroehmann investigated the charges against Leonard by discussing the incident with Wiegand, the only eyewitness, and all key witnesses testified at the arbitration hearing. The arbitrator's conclusion that Stroehmann denied Leonard industrial due process is unfounded. We disagree with the statement in the dissent that the decision to suspend before confrontation evidences "prejudgment." Dissent at 1452. This is not a case in which the employer acted without affording the employee any opportunity to tell his version of events. While it is true that Stroehmann decided to suspend Leonard pending further investigation before management spoke to him, the decision to discharge Leonard was not made until after he gave his version of the incident and the employer's investigation was completed. Even then, Leonard was given a second opportunity to tell his side of the story. Given that opportunity, his only response was that he could not have been listening to erotic CB conversation because his CB radio was broken. The broken radio would be evidence that he had not been listening to such conversations. It is not evidence that he did not tell Wiegand he had been doing so. Therefore, the dissent's reference to Stroehmann's refusal of Leonard's request that management verify this by examining the radio is puzzling.

The cases the Union cited for the Court at oral argument stand for the unobjectionable general proposition that arbitrators' awards that reinstate discharged employees are not subject to judicial interference if the employer did not afford the employee industrial due process. In *Chauffeurs*, 613 F.2d at 717, and *Federated Dep't Stores v. United Food & Commercial Workers Union, Local 1442*, 901 F.2d 1494, 1495 (9th Cir.1990), the employers gave the employees no opportunity to respond to the charges against them. In *Super Tire Eng'g Co. v. Teamsters Local Union No. 676*, 721 F.2d 121, 122–123 (3d Cir.1983), *cert. denied*, 469 U.S. 817, 105 S.Ct. 83, 83 L.Ed.2d 31 (1984), we upheld an arbitrator's award reinstating an employee because he was fired without notice that he could be discharged for the one offense he committed, though the arbitrator found that he did commit the offense. In *Safeway Stores, Inc. v. United Food Workers Union, Local 400*, 621 F.Supp. 1233, 1236 (D.D.C.1985), the arbitrator's award reinstated an employee because of the employer's industrial due process violation in not informing the employee of all the sources of the charges against him until after he was discharged. Finally, in *Anaconda Co. v. District Lodge No. 27 of the Int'l Ass'n of Machinists*, 693 F.2d 35, 36 (6th Cir. 1982), an arbitration award was upheld reinstating an employee because he was not allowed union representation when the charges against him were presented to him though he requested such representation. These cases are inapposite because, as we have already concluded, Stroehmann did not reach its decision to discharge Leonard without respecting industrial due process.[7]

7. The writer of this opinion believes this case could be decided on an alternate ground. Even if Stroehmann did not fully afford Leonard industrial due process, the writer believes that failure cannot completely override all other public policy concerns. In this respect, he would be careful to distinguish the concept of industrial due process from due process as required by the Constitution. The writer further believes that the Supreme Court's public policy exception to the general rule against court review of the merits of a labor arbitration decision implies that a labor arbitrator's concept of industrial due process does not override a definitive public policy. *See Misco*, 108 S.Ct. at 370–71. Thus, he concludes that a lack of full industrial due process, had it occurred, would not provide a reason for reversing the district court's order vacating Arbitrator Sands' award of reinstatement of Leonard. Because the writer also believes, however, that Leonard was afforded industrial due process here, he is in full accord with the disposition of this case on the rationale that industrial due process was not violated.

The Union also argues that the district court should not have vacated the award because it based its holding on an incorrect conclusion that the arbitrator was biased towards Leonard particularly and against sexual harassment claimants generally. On the issue of general bias, we agree with the Union that Stroehmann and the district court took some of the arbitrator's comments out of context and exaggerated them. The district court did not vacate the arbitration award on the rationale that the arbitrator was biased. It vacated the award on the ground that it violated public policy concerning sexual harassment in the workplace, not because it determined the arbitrator to be biased. *See Stroehmann Bakeries*, 762 F.Supp. at 1190.

Because the district court relied on some comments of the arbitrator that might have exaggerated his bias because they were taken out of context, the question remains whether its remedy of a remand of the matter for a *de novo* hearing before a different arbitrator is proper. While that question is more difficult to answer, its proper resolution is affected by our scope of review. We review a district court's selection of a remedy for abuse of discretion. *Pennsylvania v. Local Union 542, Int'l Union of Operating Eng'rs*, 807 F.2d 330, 334 (3d Cir.1986).

After careful consideration, we have concluded that the district court did not abuse the discretion it had to formulate an appropriate remedial order because the record shows Arbitrator Sands was biased or partial towards Leonard. Although he may not have demonstrated general bias against all persons claiming sexual harassment, his partiality in this case is demonstrated by his behavior and comments during the hearing. Arbitrator Sands referred to the fact that Wiegand weighed 224 pounds and had no social life, and he characterized her as "unattractive and frustrated." App. at 32, 41. He allowed Leonard's attorney, over objection, to ask Jacobs: "Would you think an average man would make a pass at a woman like that?" and "Would you think an average man or yourself would make a pass at a woman that weighs 225

pounds?" App. at 174–75. Arbitrator Sands also cavalierly dismissed Zimmerman's reasons for finding Wiegand credible, *i.e.*, that she was "bashful" and "very Christian." App. at 36. Finally, and inexplicably, Arbitrator Sands disregarded Leonard's admission that he made sexual comments to Wiegand about his wife's anatomy. App. at 176, 185–86. Despite that admission, he determined:

> [N]one of [that] would have been culpable under or inconsistent with Stroehmann's rules, acceptable standards of social intercourse, or what Wiegand and Leonard's bantering business relationship had been.

App. at 36. Lastly, Arbitrator Sands also stated that if he had to make a decision on the merits he would find in Leonard's favor, even though he had previously made it clear that he had not fully considered the evidence on the employer's charge that Leonard had made improper sexual advances to and committed a battery against Wiegand. App. at 38, 40. There is no sound reason to defer to Arbitrator Sands' award. His partiality towards Leonard is sufficient to support the district court's choice of an order directing Leonard's grievance be submitted to a different arbitrator for a *de novo* hearing as an appropriate remedy in this case. The indications of bias in this case are such that we are unable to say the district court abused its discretion in directing a remand to a different arbitrator. *See Arco–Polymers, Inc. v. Local 8–74*, 671 F.2d 752, 754 (3d Cir.1982) (citing *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128–29 n. 27 (3d Cir. 1969)) ("An award may be vacated where it is shown that there was ... partiality ... on the part of the arbitrator.").

## V.

There is no genuine disputed issue of material fact and Stroehmann is entitled to judgment as a matter of law. The district court properly concluded that the arbitration award violates public policy. The arbitrator was unacceptably predisposed towards Leonard and against Stroehmann. Thus, the remand to a different arbitrator is proper as well. Accordingly, we will

affirm the district court's order granting Stroehmann's motion for summary judgment, denying the Union's cross-motion for summary judgment, and vacating the arbitration award and remanding the matter for a *de novo* hearing before a different arbitrator.[8]

BECKER, Circuit Judge, dissenting.

The majority has penned a powerful statement of the public policy against sexual harassment. I agree with the majority's vigorous condemnation of behavior of the sort that allegedly occurred at the Stauffer's store in Lititz on November 12, 1989, and I applaud the court's recognition of the importance of vindicating the rights of women in the workplace. I respectfully submit, however, that in its zeal to advance that public policy, the majority has committed two fundamental errors that seriously undermine its position. First, the majority has given short shrift to the industrial due process rights of Samuel Leonard. In my view, Stroehmann's egregious failure to provide Leonard with the procedural protections guaranteed by the collective bargaining agreement justifies his reinstatement.

Second, I believe that the majority mischaracterizes the basis for the arbitrator's decision to reinstate Leonard and hence finds violations of public policy and arbitrator bias where neither exists. As I read the arbitrator's opinion, he apparently believed that Leonard was telling the truth, was outraged by Stroehmann's disregard for procedures that it was obligated to respect under its collective bargaining agreement, and found insufficient evidence that any sexual harassment had in fact occurred. The arbitrator consequently ruled that Stroehmann had failed to carry its burden of demonstrating just cause for

discharge and ordered that Leonard be reinstated. This run of the mill arbitration award was not only perfectly appropriate and well within the arbitrator's discretion, but is subject only to an exceedingly narrow scope of judicial review.[1]

With all due respect to the majority, I suggest that, even when public policy is involved in a discharge case, arbitrators must begin at the beginning—with fair proceedings and fact findings. Stroehmann did not conduct such fair proceedings and fact findings here and was hence unable to carry its burden of proof to show just cause for discharge at the arbitration hearing. The majority opinion essentially requires Leonard to *disprove* the allegations against him, a requirement which, in my view, constitutes an unfair shifting of the burden of proof. I would therefore reverse the order of the district court and reinstate the arbitrator's award.

Further, I disagree with the majority's affirmance of the remand of this matter to a different arbitrator. The majority concedes that the district court, in justifying its decision to remand to a different arbitrator, took several of the original arbitrator's comments out of context. Nevertheless, the majority asserts that it cannot disturb the district court's discretionary choice to remand to a different arbitrator. I believe that the arbitrator's opinion, no matter how carefully dissected, does not reveal any bias. Additionally, the majority sets another troubling precedent when it relies on the arbitrator's alternate ground for decision—that is, that no sexual harassment in fact occurred—to demonstrate arbitrator bias. By so deciding, the majority will allow district courts in future arbitration cases to remand to different arbitrators (and implicitly find arbitrator bias)

---

**8.** Our holding does not, as the dissent states, transfer from labor arbitrators to the judiciary the power to decide grievances arising under collective bargaining agreements nor does it require the employee to disprove all allegations of sexual harassment that may be made against him. It does permit an unbiased arbitrator to decide impartially whether the allegations against Leonard are true or false, and if true, whether the appropriate discipline is discharge.

**1.** I have previously criticized the exceedingly narrow review we have given to arbitral awards, see *News America Publications, Inc., Daily Racing Form Division v. Newark Typographical Union, Local 103*, 921 F.2d 40, 41 (3d Cir.1990) (Becker, Statement Sur Denial of Rehearing In Banc) (arguing that the narrow scope of review of arbitral awards effectively gives "all power to the arbitrators," id. at 42, but I am bound by our precedent).

simply because arbitrators have given alternate grounds for their decisions.

For these reasons, I respectfully dissent.

### I.

My disagreement with the majority begins with its recitation of the facts and with its description of the arbitration process. Two aspects of the majority's factual account merit elaboration.

#### A. *The Arbitrator's Decision*

In my view, the majority mischaracterizes what the arbitrator found in deciding to reinstate Leonard. The majority concludes that the arbitrator refused to decide whether the sexual harassment against Wiegand actually occurred. It derives this conclusion from, among other things, "the substance of the opinion, read as a whole." Majority Opinion, Note 2. With all respect, the majority misapprehends what the arbitrator decided.

The arbitrator expressly stated his view at numerous points that there was insufficient evidence to find that sexual harassment had in fact occurred. His opinion explicitly suggested that there was not a sufficient basis to believe Kimberly Wiegand's allegations: "If Stroehmann's investigation had been at all consistent with the severity of Wiegand's accusations and of their consequences for Leonard's life *and* if that investigation had provided an *adequate basis* to believe that Leonard had behaved as charged, Stroehmann's discharge decision would have been unassailable." (emphasis added).[2] In finding that Stroehmann's discharge decision would have been unassailable had it had an adequate basis, the arbitrator implicitly held that there was an inadequate basis for the charge of sexual harassment.[3]

The remainder of the arbitrator's opinion also suggested that he found the charge against Leonard unsubstantiated. He (correctly) characterized the information on which Stroehmann relied in making its discharge decision as "double hearsay." He also stated quite clearly that if the issue of resolving the credibility of witnesses were before him, "Stroehmann would have had to lose for having failed to bear its burden of proof." In short, contrary to the implication of the majority opinion, the arbitrator did not refuse to find whether sexual harassment occurred. Rather, he found 1) that Stroehmann had not complied with the

**2.** In discussing my characterization of the arbitrator's opinion, the majority states, "The dissent is wrong." Majority Opinion at 1444. The majority bases its conclusion on the surrounding sentences of the arbitrator's opinion in which the arbitrator stated that he was not required, *under the circumstances, to weigh the evidence* and evaluate the credibility of the witnesses. I find the majority's conclusion somewhat puzzling in this regard because elsewhere in its opinion, the majority appears to agree with my reading of the arbitrator's opinion: "[H]e stated that if he had to make a factual determination regarding the occurrence of the incident, he would have to find in favor of Leonard because he had insufficient evidence to determine whether Leonard or Wiegand was more credible." Majority Opinion at 1440. Because Stroehmann had the burden of demonstrating just cause for discharge under the agreement, its failure to demonstrate Wiegand's credibility required the arbitrator to find for Leonard. At the very least the surrounding sentences do not undermine the clear import of the arbitrator's views.

**3.** I note in this regard that the majority opinion fails to address the inconsistencies in Wiegand's

underlying story, which would tend to exculpate Leonard. The majority suggests that there is no dispute about what Wiegand says occurred on November 12, 1989. In fact, the record reflects at least two different versions of the facts, related at different times by Wiegand. In one story, told to her mother, Wiegand alleged that Leonard sexually harassed her after he had finished delivering all of his products, and the harassment consisted of pushing against her and grabbing her breast. In the other version, told to Stroehmann officials Steve Garrett and Joe Jacobs, the sexual harassment began immediately upon Leonard's arrival in the store. The second version contained details omitted from the first version, including a discussion of an erotic CB radio conversation and comparisons of the firmness of her breast to an orange.

My point is not that one of these incidents would constitute sexual harassment and one would not. Nor is it to suggest that Wiegand was fabricating her story. The inconsistency in the underlying alleged facts does suggest, however, that because of the shoddy manner in which Stroehmann conducted its investigation, Stroehmann might not have satisfied its burden of proof under the "just cause" section of the collective bargaining agreement.

requirements of the collective bargaining agreement because it had not adduced sufficient evidence to discharge Leonard under the just cause provision of the collective bargaining agreement and 2) there was an inadequate basis for believing that the sexual harassment had in fact occurred.

**B.** *Requirements of the Collective Bargaining Agreement*

The majority opinion does not contain an extensive discussion of the salient requirements of the collective bargaining agreement that governed the severance of the employment relationship. It is therefore important to note that the agreement required that "higher management ... investigate and collect the facts before a final and official dismissal is declared." As I read the record, no such investigation took place. The arbitrator's finding that the investigation of Leonard was insufficient in light of Stroehmann's failure to honor its obligations under the collective bargaining agreement therefore seems perfectly in accord with the arbitrator's obligations in construing the agreement, regardless of whether sexual harassment in fact occurred.

## II.

I agree with the majority's statement that courts owe broad deference to arbitrators in the construction of collective bargaining agreements. Indeed, the Supreme Court has held that "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers International Union v. Misco*, 484 U.S. 29, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987). I also agree with the majority that courts may review arbitrators' awards to ensure that those awards are consistent with public policy. I believe, however, that the majority's abbreviated discussion of the narrow contours of that review leads it into error, and I therefore discuss briefly my understanding of the scope of our review.

As the Supreme Court has held, the ability to review arbitrators' awards for violations of public policy "does not ... sanction a broad judicial power to set aside arbitration awards as against public policy." Id. at 373. *Misco* made clear that the mere showing that a public policy was implicated in the decision to discharge an employee is not sufficient to reverse an arbitrator's award. Rather, the award itself must contravene public policy. As the Court stated in *Misco:*

[A] court's refusal to enforce an arbitrator's interpretation of such contracts is limited to situations where the contract as interpreted would violate "some explicit public policy that is well-defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.' "

Id. at 373.

In *United States Postal Service v. National Association of Letter Carriers, AFL–CIO*, 839 F.2d 146 (3d Cir.1988), decided in the wake of *Misco*, we defined more specifically the limited contours of judicial review of arbitrators' decisions:

[T]he Court in *Misco* delimited the methods by which a public policy and its contravention are to be ascertained. *Misco* specifically rejected, as exceeding the court's reviewing authority, techniques employed by a district court in: (1) asserting a public policy without substantiating its existence within existing laws and legal precedents, and thereby failing to distinguish its pedigree as a 'well defined and dominant' policy as opposed to a 'general consideration of supposed public interests;' (2) second-guessing the arbitrator's factfinding particularly insofar as the conclusion that the asserted public policy would be violated by the employee's reinstatement depends on drawing factual inferences not made by the arbitrator; (3) second-guessing the arbitrator's reasonable construction of the 'just cause' clause, and the rules of evidence and procedure appropriate to a 'just cause' determination under the collective-bargaining agreement.

Id. at 148. *Postal Service* thus prohibits setting aside arbitrator's awards: 1) when there is no showing that a dominant and well-defined public policy exists; 2) when a judicial finding that the public policy would be violated relies on inferences of fact not made by the arbitrator; and 3) when a court's finding that a public policy has been violated is, in actuality, merely a disagreement with the arbitrator's construction of a just cause provision. Thus, in reviewing arbitrator's decisions, we must do more than merely ascertain that a genuine public policy is involved. We must also determine, based on facts that the arbitrator has found, that the award would violate public policy.

### III.

The majority has faithfully complied with the requirement of ascertaining a dominant and well-defined public policy. As its opinion details, a public policy against sexual harassment in the workplace can readily be derived from federal statutes and regulations as well as from judicial decisions. I agree that if the public policy against sexual harassment were offended by this arbitrator's decision, the award could not stand.

My agreement with the majority ends there, however. The majority's opinion rests on inferences of fact not made by the arbitrator and, at bottom, quarrels with the arbitrator's construction of the just cause

provision. Although the public policy against sexual harassment is tossed loosely about in the majority's opinion, it is crucial to understand what is *not* at stake in this case. The majority's opinion cannot claim, based on this record, that Leonard is likely to commit sexual harassment again (if he ever has) if he is reinstated. Nothing in the arbitrator's factfinding, or, indeed, in the entire record, suggests that Leonard would ever again (if he ever has) sexually harass another woman.[4]

Instead, the majority finds a violation of public policy in the arbitrator's failure to make a conclusive determination whether such harassment occurred. As I have already suggested, I believe that the arbitrator made the best possible determination that he could about whether any harassment occurred, and concluded that it did not. See pages 1438–39. That is sufficient, in and of itself, to uphold the arbitrator's award. Even assuming, however, that the arbitrator made no determination about harassment, the majority must demonstrate why his failure to do so violates public policy. Nothing in the record suggests that the award will directly promote further sexual harassment by Leonard; therefore, the public policy in favor of discouraging sexual harassment itself is not implicated.

Rather, the majority holds that "an arbitrator's award reinstating an employee ac-

---

**4.** That fact makes this case plainly distinguishable from *Newsday, Inc. v. Long Island Typographical Union, No. 915,* 915 F.2d 840 (2d Cir. 1990). In *Newsday,* an employer suspended an employee for sexual harassment. An arbitrator sustained the suspension and held that any further incidents of harassment would lead to discharge. After this initial arbitration, the employer discharged the same employee after more complaints of sexual harassment had been made against him. Id. at 842. At the second arbitration, the arbitrator specifically found that these repeated incidents of sexual harassment had, in fact, occurred. Id. at 843. The arbitrator acknowledged that reinstatement might possibly lead to further incidents of sexual harassment but decided that, in the event further incidents occurred, they would lead to the employee's discharge. In so deciding, the second arbi-

trator ignored the first arbitrator's command that any further incidents of sexual harassment should lead to discharge. The Second Circuit held that, in light of the earlier ineffective warning and in light of the likelihood of further sexual harassment, reinstatement of the employee would violate public policy.

In this case, there has never been a *finding* that Leonard sexually harassed anyone. As I have explained, there was an implicit finding that no such sexual harassment occurred. Even if there were such a finding of past behavior, however, there is no indication in this record that Leonard's reinstatement *is likely to lead to* further sexual harassment. Therefore, unlike *Newsday,* the public policy against sexual harassment per se is not offended by reinstating Leonard.

cused of sexual harassment without a determination regarding the merits of the allegation violates well-established and dominant public policies concerning sexual harassment in the workplace." Majority Opinion at 1438. This public policy analysis is deeply flawed. At the outset, I cannot see how guaranteeing procedural fairness to employees accused of sexual harassment can violate the public policy against sexual harassment. It is merely an extension of the arbitration principle that employees accused of any wrongdoing are accorded fair treatment and protected from the impulses of their employer.

Further, and more egregiously, the majority's holding skews the rules governing arbitration of claims of sexual harassment against an employee. If an employee is accused of sexual harassment and cannot conclusively disprove its occurrence, the majority would find a violation of public policy if that employee is reinstated. This effectively shifts the burden of proof to the accused employee. I do not believe that placing such a burden on accused employees is required or justified by the public policy against sexual harassment. Moreover, I believe that such a practice would directly contravene the just cause clause for which the parties have bargained.

The majority attempts to narrow its holding by confining it to "the circumstances present here," see Majority Opinion at pages 1438, 1442. There is, however, no logical reason why this case will differ from any future case where a company accuses an employee of some offense violative of public policy that the employee cannot disprove at arbitration. If the majority believes this case to be unique because the arbitrator was biased, then the case can be resolved on the basis of his bias alone without reference to public policy. See *Misco*, 108 S.Ct. at 371 (noting that arbitration decisions resulting from fraud or arbitrator dishonesty and fraud can be set aside). The majority, however, relies heavily on public policy, and because there is no

analytic difference between this case and future cases where companies allege that employees have committed acts violative of public policy which cannot be conclusively proven or disproven, the employee, under the majority's logic, might retain the burden in this circuit to disprove the occurrence of the act which is said to violate public policy.

The majority's holding is unprecedented, and its effort to distinguish prior cases is unpersuasive. Indeed, two recent cases strongly militate against the majority's conclusion. In *Communication Workers of America v. Southeastern Electric Cooperative*, 882 F.2d 467 (10th Cir.1989), the Tenth Circuit upheld an arbitrator's award reinstating after a period of suspension an employee who had undisputedly engaged in sexual harassment. The court held that it could not disturb the arbitrator's award despite the fact that a known sexual harasser would eventually be allowed to return to the workplace. The Seventh Circuit reached a similar conclusion in *Chrysler Motors v. International Union, Allied Industrial Workers of America*, 959 F.2d 685 (7th Cir.1992). In *Chrysler*, an employee had undoubtedly engaged in egregious sexual harassment. The company discharged the employee, but the arbitrator reduced the penalty to a thirty-day suspension. Essentially rejecting the argument that the majority makes here, the Seventh Circuit found no violation of public policy despite the employee's reinstatement after the company had overwhelmingly established that sexual harassment had occurred. Here, the majority finds it a violation of public policy for an arbitrator to reinstate an accused sexual harasser, against whom a case of sexual harassment could not be proven. If those who have sexually harassed can return to work without contravening public policy, certainly those against whom there is an insufficient basis to prove sexual harassment can also return to work without contravening public policy.

Our own precedents compel the same conclusion. In *Postal Service*, 839 F.2d at 149, we upheld an arbitrator's award rein-

stating an employee who had fired a gun at his employer's car. We approved that award as consistent with public policy because "[a] judgment about the offending employee's amenability to discipline comes under the scope of the arbitrator's factfinding authority ..." Id. at 149. Even though the employee was arguably likely to commit other acts of violence against employees, we did not find a contravention of public policy. Similarly, in this case, where no sexual harassment has been found in the first place, I would hold that we should defer to the arbitrator—who has evaluated the credibility of witnesses and evaluated what, if any, discipline is appropriate—to reinstate Leonard.

## IV.

Nor is the majority content to find a public policy violation and invalidate the award of the arbitrator on that basis. The majority, in the name of public policy, intrudes on what courts have repeatedly reserved for the arbitrators and reverses the arbitrator's award because it finds unreasonable the arbitrator's construction of the just cause provision.

As the majority acknowledges, arbitrators have repeatedly relied on the doctrine of industrial due process in construing just cause provisions. See generally Frank Elkouri and Edna Asper Elkouri, *How Arbitration Works* 673 (Bureau of National Affairs 1985). That doctrine is well-established in the jurisprudence of labor arbitration, see id at 673 n 116 (collecting cases), and in federal labor jurisprudence, see *Super Tire Engineering Co v. Teamsters Local Union No. 676*, 721 F.2d 121, 124–25 (3d Cir.1983); *Federated Dep't Stores v. United Food & Commercial Workers Union, Local 1442*, 901 F.2d 1494, 1497 (9th Cir.1990). In this case, the arbitrator made clear in his opinion his belief that the collective bargaining agreement required Stroehmann to do two things that it failed to do in this instance: 1) to conduct a high-level management investigation with procedural protections for Leonard; and 2) to carry its burden of proof and demonstrate that the harassment had occurred.

The majority states its belief that Stroehmann afforded Leonard ample due process in its discharge decision. I believe that the facts clearly demonstrate otherwise. Under the collective bargaining agreement, Leonard was entitled to a thorough investigation of the charges against him by high-level management which he never received. Also, Stroehmann officials admitted at the arbitration hearing that they had made the decision to suspend Leonard before ever hearing his version of the story. As if the prejudgment were not troubling enough, Stroehmann officials refused to consider what may have been the most significant (and perhaps the only) objective evidence in the case—the broken CB radio. Immediately upon being told of Wiegand's charge against him, Leonard told Stroehmann officials that Wiegand's description of Leonard's tale of an erotic conversation over the CB radio was demonstrably false because his CB was broken. Leonard stated that he had offered Stroehmann officials the opportunity to inspect it, which they declined. Additionally, as I have noted above, there were inconsistencies in Wiegand's story that Stroehmann chose to ignore. See note 3. These undisputed facts point to the conclusion that Leonard was deprived of industrial due process.

Even assuming that the investigation was adequate, however, Stroehmann did not carry its burden at the arbitration of showing that Leonard was discharged for just cause. The arbitrator found that the collective bargaining agreement required Stroehmann to provide sufficient evidence for a "supportable judgment" to demonstrate that the harassment had occurred. The arbitrator, to whom we owe complete deference in factfinding in the absence of fraud or dishonesty, see *Misco*, 108 S.Ct. at 371, found that the facts were inadequate to support a judgment that sexual harassment had occurred.

At all events, even if, after *de novo* review, we believed that Leonard had been afforded sufficient due process and Stroehmann had proven its case, we would still not be entitled to reverse the arbitrator's award. As *Misco* makes clear, we owe

deference to the arbitrator when he is even arguably construing the collective bargaining agreement. Id. There can be no doubt that the arbitrator in this case articulated what he believed was required by the collective bargaining agreement. That interpretation and his factfinding cannot be disturbed absent a showing that the decision was procured "through fraud or through the arbitrator's dishonesty ..." Id. No such showing was made, and the majority does not so argue.

In sum, despite the fact that precedent requires overwhelming deference to the arbitrator, the majority articulates no reason why such deference should not be accorded in this case, except that an important public policy principle is at stake, namely sexual harassment. With all respect, I believe that formulation turns the process of reviewing arbitration awards upside down. Because this undermines the entire arbitration process in sexual harassment cases, I would reverse the judgment of the district court and reinstate the arbitrator's award.

## V.

Finally, the majority approves the district court's assault on the arbitrator's decision in this case by affirming the district court's remand of this case to be heard anew before a different arbitrator. It does so despite acknowledging that the district court misrepresented the arbitrator's comments and that the arbitrator did not exhibit inappropriate attitudes about sexual harassment generally. Majority Opinion at 1446. Instead, the court bases its decision to choose a different arbitrator: 1) on our deferential scope of review of the district court's discretionary choice of a remedy; and 2) on the arbitrator's allowance of questions at the hearing and on various comments that the arbitrator made in his opinion. The majority concludes that these comments demonstrate sufficient bias against this particular sexual harassment claim to hold that it was not an abuse of discretion for the district court to remand the matter to a different arbitrator. Alternatively, the majority submits that the arbitrator's statement that if he had to make a

finding on the merits he would rule in favor of Leonard, suggests a bias that merits remanding this case to a different arbitrator.

This record simply does not support the majority's contention that the arbitrator exhibited bias against this sexual harassment claim. Each reference that the majority makes to indications of bias in the record is fully explicable if the statements are put in context. The arbitrator did allow questions about whether "an average man" would sexually harass Wiegand. But the arbitrator's opinion itself suggests that such considerations were irrelevant to his decision and that he found them offensive. He commented, "[W]hether or not Wiegand is a very Christian girl, or whether Wiegand's words or acts may have invited Leonard's alleged misconduct[,].... sexual misconduct of the kind charged is absolutely inappropriate and should support immediate discharge." The majority further engages in mischaracterization of the arbitrator's opinion by excerpting the phrase "unattractive and frustrated." In fact, the arbitrator suggested that to conclude that Wiegand had not been sexually harassed because she was unattractive and frustrated would be an "illogical conclusion." In sum, the arbitrator was not biased against the claim. Instead, he rejected the evidence produced by Stroehmann's shoddy investigation.

The majority also rests its decision to remand to a different arbitrator on the arbitrator's statement that if he had to decide the ultimate issue of whether sexual harassment occurred, he would rule for Leonard because there was insufficient evidence to demonstrate that sexual harassment had occurred. The majority opines that this statement indicates that the arbitrator has already prejudged the case. To me, the arbitrator's comments only suggest that the majority's interpretation of the case is incorrect from the outset. The arbitrator found that Leonard had not been given due process, which entitled him to reinstatement, and found, in the alternative, that there was insufficient evidence of sexual harassment to terminate Leonard.

**1454**

Trial judges frequently "layer" their opinions in this manner.

There is no logical difference between the remedy that the majority approves in this case and remanding an Article III case with directions that it be assigned to a different district judge because that judge has provided alternate bases for his or her decision. I cannot conceive of our ordering such a reassignment merely because the judge had provided an alternate basis for his or her opinion, or on evidence of bias as flimsy as it is here. We should be even less willing to direct the remand of the present matter to a different arbitrator because of the heightened deference we owe to the arbitrators' decisions. Although I would not remand in the first instance, I believe that if we must remand, we should remand to the same arbitrator.

### VI.

For the foregoing reasons, I would reverse the judgment of the district court and reinstate the arbitration award.