**BROOKDALE HOSPITAL MEDICAL CENTER, Petitioner,**

v.

**LOCAL 1199, NATIONAL HEALTH & HUMAN SERVICE EMPLOYEES UNION, Respondent.**

**No. 99 Civ. 9189(RMB).**

United States District Court, S.D. New York.

July 14, 2000.

Joel E. Cohen, Lisa Victoria Moran, McDermott, Will & Emery, New York City, for petitioner.

Jennifer Weillig, Eisner & Hubbard, P.C., New York City, for respondent.

## ORDER

BERMAN, District Judge.

On or about August 27, 1999, Brookdale Hospital Medical Center ("Petitioner" or "Brookdale" or "Employer") commenced this action against Local 1199, National Health & Human Service Employees Union ("Respondent" or "Union") to vacate an Opinion and Award issued on July 12, 1999 ("Award") by labor arbitrator Lois A. Rappaport ("Arbitrator"). The Award reinstated five employees ("Grievants") that Petitioner had discharged because they had allegedly engaged in sexual harassment in the workplace.[1] The Union contends that the Grievants were discharged without just cause and that the Award reinstating them should be confirmed. **For the reasons set forth below, this Court remands the Award to Arbitrator Rappaport for further clarification as to her findings.**[2]

1. The Petitioner contests only the reinstatement of four Grievants (Messrs. Williams, Angelo Brown, Sean Brown and Kelly), not Mr. Culzac. Petitioner states that "because the Arbitrator found that Mr. Culzac did not sexually harass Ms. Ellis, his reinstatement is not challenged here." (Pet'r Mem. in Supp. of Pet. to Vacate ("Pet'r Mem.") at 6).

2. The parties had engaged in arbitration pursuant to a collective bargaining agreement effective July 1, 1992 to June 30, 1995

## I. *Background*

Grievants Freeman Williams, Leslie Culzac, Angelo Brown, Sean Brown and Dale Kelly all worked for Petitioner as part-time or full-time transporters. (Mr. Williams worked as the Lead Transporter and, on weekends, as Dispatcher.) The Petitioner had hired Mr. Williams on January 29, 1990; Mr. Culzac in October, 1995; Mr. Angelo Brown in July, 1994; Mr. Sean Brown in 1991; and Mr. Kelly in January, 1989. (Award at 5).

Petitioner contends that over a period of six months the Grievants sexually harassed and created a hostile work environment for a female co-worker, Transporter LaTisha Ellis. Ms. Ellis, hired as a Transporter in November 1997, testified that she was "treated fine" at first by the Grievants but then it "got out of hand." (*Id.*, at 9).

Ms. Ellis described several alleged incidents involving one or more of the Grievants. Ms. Ellis testified that Mr. Williams "would approach her, make comments about her physical appearance, and ask her when she was going to sleep with him" and that Mr. Williams "would bump her and push up against her in the elevator and would continue to touch her even after she told him to stop." (*Id.*). She also described an alleged incident in which "Mr. Williams dragged her down the hall to the bathroom ... pushed her in, turned off the light and had her against the wall [trying] to get her pants off." (*Id.*). Though Ms. Ellis could not recall when this occurred, she testified that she "pushed [Mr. Williams] away, turned on the lights and told him to stop." (*Id.*). Ms. Ellis described another incident which

("CBA"). The CBA was subsequently extended through October 31, 2001. Article XXXII of the CBA provides that: "A grievance, as defined in Article XXXI, which has not been resolved thereunder may, within thirty (30) working days after completion of Step 3 of the grievance procedure, be referred for arbitration by the Employer or the Union to an arbitrator selected in accordance with the procedures of the American Arbitration Association ..."

presumably occurred on March 28, 1998, in which she told Mr. Williams, who was sitting in her lap, to "get the fuck off me," to which Mr. Williams replied that he " 'does not disrespect her' as she had just done to him and he hit her on the shoulder with his open hand." (*Id.*, at 10). According to Ms. Ellis, Mr. Culzac also "asked her for sex and had kissed her behind the staircase," and when she found out that he was married, she "told him to stop, but he did not." (*Id.*).

Ms. Ellis also described an incident which allegedly occurred on Sunday, March 29, 1998, which involved her, Mr. Sean Brown, Mr. Angelo Brown and Mr. Kelly. Ms. Ellis testified that, in this incident, "Mr. Kelly unzipped his pants, put jelly on his pants and then made a bet with [Mr.] Sean Brown and [Mr.] Angelo Brown that Ms. Ellis would lick it off of him." (*Id.*). George Nicholas, who, according to Ms. Ellis, was in the room at the time, "held the money" that the others put down. (*Id.*). Ms. Ellis testified that she was upset and "did not make it known" that she was going to perform the act and then "took the money and left." (*Id.*). She testified that when Mr. Angelo Brown later asked Ms. Ellis for his money back and she said she did not have it, he said "I am not playing with you, I will kill you." She then said that "the money was on the desk ... and she threw the $20. on the desk." (*Id.*, at 10–11). Ms. Ellis testified that she "was romantically interested in

Mr. Williams and that she and Mr. Culzac had had a romantic relationship." (*Id.*, at 11). She also said that after Susie Williams [another Transporter] "told her that both men were married, she was no longer interested in them and told them to leave her alone." [3] (*Id.*).

From April 3, 1998 to April 15, 1998, Grievants individually received disciplinary notices from Petitioner suspending them "indefinitely pending investigation for a violation of the Employer's sexual harassment policy." [4] (*Id.*, at 5). On May 8, 1999, Petitioner terminated Grievants, following an investigation conducted by Senior Vice President Margaret Johnson. Ms. Johnson stated that "in accordance with the Employer's policy against sexual harassment, [she] began an investigation" and "questioned the credibility of those questioned." Ms. Johnson found Ms. Ellis to be "credible" and a "simple, immature, timid woman who was the victim of daily intimidation by people who would make fun of her." (*Id.* at 15). Ms. Johnson concluded that "termination was the appropriate penalty for all five individuals because they 'participated in inappropriate conduct, use of offense [sic] language.' " (*Id.*, citing Employer Ex. 9). These termination actions gave rise to the instant arbitration. [5] Ms. Johnson also included in her report to the Employer's human resources department a "charge" that Mr. Angelo Brown "threatened the life of two Brook-

---

3. Ms. Williams, not Ms. Ellis, reported these incidents to the Employer because of her "personal disgust with the Grievants' behavior." (Award at 14, citing Employer Br. at 2).

4. **The Employer's policy, set forth in its Employee Handbook, defines sexual harassment as follows: "Unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature made either explicitly or implicitly constitute sexual harassment." (Award at 23, citing Employer Ex. 3). Article XXIX of the CBA provides that: "The Employer shall have the right to discharge, suspend or discipline any Employee for cause."**

5. Articles XXXI and XXXII of the CBA provide for a three-step grievance procedure after which grievances may be "referred for arbitration by the Employer or the Union to an arbitrator selected in accordance with the procedures of the American Arbitration Association." A grievance is defined as a "dispute or complaint arising between the parties hereto under or out of this Agreement or the interpretation, application, performance, termination, or any alleged breach thereof." Over Petitioner's objections, Arbitrator Rappaport found that all five grievances "were timely filed and [were] arbitrable." Award at 8).

dale employees"[6] and a "charge" against Mr. Culzac for "failure to cooperate with the Hospital's investigation." (*Id.*).

The Employer contends, among other things, that the actions of the Grievants created "a hostile work environment for Ms. Ellis and subjected her to unwanted sexual, physical and verbal abuse." (*Id.* at 9). Petitioner does not oppose the reinstatement of Mr. Culzac but does oppose the reinstatement of the other four Grievants as violative of the public policy against sexual harassment in the workplace.[7] Respondent cross-moves this Court to confirm the Award. Respondent argues that "summary affirmance of arbitration awards is the rule, and the public policy exception the Employer seeks to invoke is very narrow." (Resp't Mem. in Opp'n to Pet'r Pet. to Vacate ("Resp't Mem.") at 1). Respondent contends that Petitioner has failed its burden to prove that there is a "well-defined and dominant public policy calling for the industrial equivalent of capital punishment for every incident which an employer characterizes as sexual harassment." (Resp't Reply Mem. In Supp. of Cross–Pet. to Confirm ("Resp't Reply Mem.") at 1).

## II. *Arbitrator's Findings*

The Arbitrator rendered her decision on July 12, 1999. While the Arbitrator seems to have concluded that some of the allegations were not conclusively proven, the following was established:

*Mr. Williams.* "It is undisputed that there was an interaction between Ms. Ellis and Mr. Williams on March 28, 1998 in the Transportation Office." (*Id.*, at 24). However, the Arbitrator found "most of the testimony given by Mr. Williams, Ms. Ellis and Ms. Susie Williams to be in conflict." (*Id.*). The Arbitrator "credit[ed] the testi-mony of Ms. Ellis and Ms. Williams," (*Id.*, at 25), and concluded that "regardless of whether Mr. Williams was sitting on Ms. Ellis' lap or sitting next to her and touching her under the table, Mr. Williams was engaging in inappropriate conduct." (*Id.*). The Arbitrator further stated that she was "supported in reaching the conclusion that Mr. Williams was engaged in inappropriate conduct and was 'playing' with [Ms. Ellis] given his testimony that he told Ms. Ellis 'I will not play with you no more and you will not play with me. I will dispatch and you will take them and that's it.'" (*Id.*). The Arbitrator did not "find Mr. Williams' testimony to be believable, that is, that he was merely having a discussion with Ms. Ellis and she became upset because of a work assignment and his mention of Richie Williams." (*Id.*). The Arbitrator did "credit Mr. Williams' testimony that after Ms. Ellis told him to leave her the 'fuck' alone, he stated to her, 'You are being disrespectful now. I don't curse at you, so I would appreciate it if you don't curse at me.'" (*Id.*). The Arbitrator was "persuaded that it was Ms. Ellis who hit Mr. Williams in her attempt to dislodge him from her lap or to get him to stop touching her. Accordingly, the Arbitrator [found] no reason there in for Mr. Williams to have hit Ms. Ellis, as she claim[ed]." (*Id.*, at 25–26). With respect to Ms. Ellis' allegation that Mr. Williams dragged her down the hallway and into the bathroom, the Arbitrator found that Ms. Ellis' testimony "strain[ed] credulity . . . [and] her answers [were] . . . vague and inconsistent," (*Id.*, at 26–27), and therefore "[did] not find Ms. Ellis' testimony . . . to be believable . . . [and concluded] that [the] incident did not occur." (*Id.*, at 27). The Arbitrator also found it "incredible" that "Ms. Ellis could not remember when this event occurred, nor did she report it" and

---

**6.** Ms. Hortensia Medina, another Transporter, had testified about the actions of several of the Grievants, and alleged that Mr. Angelo Brown had "screamed at her and threatened her when she was near the windown [sic] on the East 98th Street side of the building."

The Arbitrator, however, did not "find Ms. Medina's testimony to be persuasive given its inconsistent and contradictory nature." (*Id.* at 31).

**7.** *See supra* note 1.

that "the record indicates that even after this calamitous event, Ms. Ellis continued to speak to, and be friendly with, Mr. Williams." (*Id.*, at 27). The Arbitrator concluded that "Mr. Williams did not engage in a sexual assault of Ms. Ellis," (*Id.*), but "that Mr. Williams engaged in unwanted touching of Ms. Ellis which constitutes sexual harassment" and that "the charges terminating Mr. Freeman Williams [were] sustained in part." (*Id.*).

*Mr. Angelo Brown.* "It is undisputed that an interaction occurred between Ms. Ellis, Mr. Kelly, Mr. Angelo Brown and Mr. Sean Brown on March 29, 1998 in which a money wager was made." (*Id.*, at 27). The Arbitrator found that "Ms. Ellis admitted that she threw a packet of jelly" and that "a packet of jelly landed in Mr. Kelly's lap, although how it got there is in dispute," and that "a money bet was made by Mr. Angelo Brown and Mr. Sean Brown ..." (*Id.*, at 28). The Arbitrator also found that "both Mr. Sean Brown and Mr. Angelo Brown engaged in inappropriate behavior when they participated in the bet regardless of whether or not they thought it was all a joke." (*Id.*, at 29). The Arbitrator concluded that "while Ms. Ellis' behavior in throwing the jelly can be questioned, ... it was Mr. Kelly, Mr. Angelo Brown and Mr. Sean Brown who engaged in inappropriate conduct." (*Id.*, at 30). "It is undisputed that Mr. Angelo Brown asked Ms. Ellis for his money back." (*Id.*, at 31). Ms. Williams testified that she "observed the interaction between Mr. Brown and Ms. Ellis" and stated that "when Ms. Ellis started to walk away from him, Mr. Angelo Brown grabbed her arm." (*Id.*). The Arbitrator found "Ms. Williams' testimony to be believable." (*Id.*). The Arbitrator was "persuaded that Mr. Angelo Brown did grab Ms. Ellis' arm in an effort to prevent her from walking away." (*Id.*). The Arbitrator was "not convinced that Mr. Angelo Brown threatened to kill her." (*Id.*). "Nevertheless, this action by Mr. Angelo Brown and his participation in the bet constitute inappropriate conduct." (*Id.*). The Arbitrator concluded that "Mr. Angelo Brown also engaged in inappropriate conduct which included the unwanted touching of Ms. Ellis" and found that "this physical conduct [fell] within the Employer's definition of sexual harassment." (*Id.*, at 33–34).

*Mr. Sean Brown.* As noted, the Arbitrator concluded that "an interaction occurred between Ms. Ellis, Mr. Kelly, Mr. Angelo Brown and Mr. Sean Brown on March 29, 1998 in which a money wager was made ." (*Id.*, at 27). The Arbitrator also found that "both Mr. Sean Brown and Mr. Angelo Brown engaged in appropriate behavior when they participated in the bet regardless of whether or not they thought it was all a joke." (*Id.*, at 29). The Arbitrator concluded that "while Ms. Ellis' behavior in throwing the jelly can be questioned, ... it was Mr. Kelly, Mr. Angelo Brown and Mr. Sean Brown who engaged in inappropriate conduct." (*Id.*, at 30).

*Mr. Kelly.* As noted, the Arbitrator concluded that "an interaction occurred between Ms. Ellis, Mr. Kelly, Mr. Angelo Brown and Mr. Sean Brown on March 29, 1998 in which a money wager was made ." (*Id.*, at 27). The Arbitrator "credit[ed] Mr. Kelly's testimony that he did not unzip his pants nor did he smear jelly on them." (*Id.*). The Arbitrator found it "unbelievable that Mr. Kelly, in the middle of his shift, would do this in a room filled with people." (*Id.*). However, "the Arbitrator [was] persuaded that a packet of jelly, which was admittedly 'probably' thrown by Ms. Ellis landed in Mr. Kelly's lap and remained there." (*Id.*). The Arbitrator was "convinced that Mr. Kelly ... did engage in inappropriate conduct when he allowed the packet of jelly to remain in his lap and then participated in a wager even though he did not proffer any money." (*Id.*, at 30). The Arbitrator concluded that "it was Mr. Kelly, Mr. Angelo Brown and Mr. Sean Brown who engaged in inappropriate conduct." (*Id.*).

*Mr. Culzac.* The Arbitrator found Mr. Culzac's testimony "regarding his actions

toward Ms. Ellis to be straightforward and blunt." (*Id.*, at 32). Mr. Culzac testified that "he would go to see Ms. Ellis at the end of his shift and he and Ms. Ellis were good friends who were 'very close.' Furthermore, Mr. Culzac stated that "if I wasn't married we might have had something more that [sic] what we had." (*Id.*, at 21). Mr. Culzac admitted that he and Ms. Ellis "did kiss in the stairwell" and that "Ms. Ellis' actions aroused him and she laughed about it." (*Id.*). After Mr. Culzac was suspended, he saw Ms. Ellis and when he asked her what was happening, he said she "rudely told him to leave her alone." (*Id.*). The Arbitrator did not find "to be credible" Ms. Ellis' testimony that she "told Mr. Culzac to leave her alone after she found out that he was married and he did not do so." (*Id.*, at 32). According to the Arbitrator, "the record indicate[d] that Ms. Ellis continued to meet with Mr. Culzac after she knew he was married." (*Id.*). The Arbitrator supported this finding by relying on the "credible testimony of Ms. Williams who stated that even after she told Ms. Ellis that Mr. Culzac was married, she [Ms. Ellis] continued to hang out waiting to get a ride home" and the fact that the "record indicate[d] that the kissing and touching incident which both Mr. Culzac and Ms. Ellis testified about took place after Ms. Ellis knew that Mr. Culzac was married." (*Id.*). The Arbitrator concluded that kissing, "regardless of whether the relationship between Ms. Ellis and Mr. Culzac was consensual or not, was not appropriate conduct for the workplace ... [and] Mr. Culzac did engage in inappropriate conduct." (*Id.*). However, the Arbitrator was not "convinced that Mr. Colzac's conduct, through [sic] considered to be inappropriate, [fell] within the Employer's definition of unwanted sexual advances, given the consensual nature of the interaction." (*Id.*, at 34). "Mr. Culzac did not engage in sexual harassment of Ms. Ellis, ... [but] his comment to her during his suspension [was] inappropriate." (*Id.*, at 33). Further, the Arbitrator was "not persuaded that Mr. Colzac[sic] did not participate in the investigatory interview connected with his discharge." (*Id.*, at 34). The Arbitrator concluded that "the charges against Mr. Culzac [were] sustained in part." (*Id.*).

Finding that "the Grievants [had] engaged in serious misconduct which warrant[ed] severe discipline," (*Id.*, at 34), the Arbitrator concluded, "after careful consideration of the facts and circumstances of these cases, the penalty of dismissal to be excessive."[8] (*Id.*, at 35). The Arbitrator concluded that disciplinary suspension and reinstatement (with seniority and benefits but without backpay) rather than discharge was appropriate for the four Grievants (Mr. Williams, Mr. Angelo Brown, Mr. Sean Brown and Mr. Kelly).[9] (*Id.*, at 36). As for Mr. Culzac, the Arbitrator concluded that he was entitled to be reinstated with seniority, benefits and with backpay, less a thirty day suspension and "monies earned." (*Id.*).

8. According to the Arbitrator, the Union had also contended that "the Grievants had been subjected to disparate treatment since Mr. Nicholas who was present at the 'jelly' incident and who participated in the incident to the extent that he held the money, was not disciplined at all." (Award at 34). The Arbitrator "reviewed the Union's arguments and [was] not persuaded that this constitute[d] an instance of disparate treatment which violates the just cause standard for discipline as the Union asserts." (*Id.*)

9. Pursuant to Article XXIX of the CBA, the Employer here has the right to "discharge, suspend or discipline any Employee for cause," but the CBA does not provide a definition of "for cause." Respondent contends that "it is well-established law that where the parties leave definition of such a term to the arbitrator, courts will not second-guess the arbitrator's decision." (Resp't Mem. in Supp. of Pet. to Confirm at 9) (citing *e.g., Burns Int'l Sec. Services, Inc. v. International Union, United Plant Guard Workers of Am. (UPGWA) and Its Local 537*, 47 F.3d 14, 17 (2d Cir. 1995)). It may be inferred that the Arbitrator here possesses full authority to define what constitutes "for cause."

### III. *Standard of Review*

The courts "play only a limited role when asked to review the decision of an arbitrator." *United Paperworkers Int'l Union v. Misco. Inc.,* 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987); *see also, W.R. Grace & Co. v. Local 759, International Union of United Rubber Workers,* 461 U.S. 757, 764, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983); *United Steelworkers of Am. v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 596, 598–99, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). "Courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." *Misco,* 484 U.S. at 36, 108 S.Ct. 364. "The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *Id.* (quoting *United Steelworkers of Am.,* 363 U.S. at 596, 80 S.Ct. 1358)). "The standard for avoiding summary confirmation of an arbitration award is very high, and the burden of proof is on the party moving to vacate the award." *In Matter of Arbitration Between Francesca Briamonte v. Liberty Brokerage, Inc.,* No. 99–2735, 2000 WL 351399 (S.D.N.Y. March 31, 2000) (citing *Willemijn Houdstermaatschappij v. Standard Microsystems Corp.,* 103 F.3d 9, 12 (2d Cir.1997). Though courts accord great deference to arbitral decisions, a district court may vacate an arbitration decision where at least one ground specified in 9 U.S.C. § 10 of the Federal Arbitration Act ("FAA") is found to exist or for "manifest disregard of the law." [10] *See e.g., Carte Blanche (Singapore) Pte., Ltd., v. Carte Blanche Int'l, Ltd.,* 888 F.2d 260, 265 (2d Cir.1989).

A district court also must "not enforce a collective-bargaining agreement that is contrary to public policy." *Misco,* 484 U.S. at 43, 108 S.Ct. 364 (quoting *W.R. Grace,* 461 U.S. at 766, 103 S.Ct. 2177); *Local 97, Int'l Bhd. of Electrical Workers v. Niagara Mohawk Power Corp.,* 196 F.3d 117, 125 (2d Cir.1999) ("Niagara Mohawk II") (amending *Int'l Bhd. of Electrical Workers, Local 97 v. Niagara Mohawk PowerCorp.,* 143 F.3d 704 (2d Cir.1998) ("Niagara Mohawk I")). The public policy exception—which is asserted here—may be the basis for vacatur only when a collective-bargaining agreement as interpreted by the arbitrator violates an "explicit public policy" that is "well-defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.' " *Misco,* 484 U.S. at 43, 108 S.Ct. 364 (quoting *W.R. Grace,* 461 U.S. at 766, 103 S.Ct. 2177). "The question of public policy is ultimately one for resolution by the courts." *Id.* The court must determine "whether the award itself, as contrasted with the reasoning that underlies the award, '[creates][an] explicit conflict with other laws and legal precedents' and thus clearly violates an identifiable public policy." *Niagara Mohawk II,* 196 F.3d at 125 (quoting *Niagara Mohawk I,* 143 F.3d at 716) (citation omitted). **The public policy against sexual harassment in the workplace is the Court's principal concern in these proceedings.**

### IV. *Analysis*

The issue here is whether the Award contravenes the public policy against sexual harassment in the workplace. *See Meritor Savings Bank, FSB v. Mechelle Vinson,* 477 U.S. 57, 64–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (recognizing that the Equal Employment Opportunity Commission (EEOC) Guidelines, issued in 1980, define "sex discrimination" under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–2(a)(1), ("Title VII"), to include "sexual harassment.") Title VII prohibits employment discrimination on the basis of

---

**10.** The FAA provides that an award may be vacated where "(1) ... the award was procured by corruption fraud or undue means[,] (2) ... there was evident partiality or corruption in the arbitrators ... [,] (3) the arbitrators were guilty of misconduct ... [; or] (4) ... the arbitrators exceed their powers ..." 9 U.S.C. § 10(a)(1) through (4).

sex. The Supreme Court of the United States has stated that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or offensive work environment." *Meritor Savings Bank, FSB,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49; *see also, Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The EEOC has promulgated regulations which help define sexual harassment under Title VII.[11] This and other judicial circuits have recognized as well-defined and dominant the public policy against sexual harassment in the workplace. *See Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197 (2d Cir.1998), *cert. denied,* 526 U.S. 1034, 119 S.Ct. 1286, 143 L.Ed.2d 378 (1999); *Stroehmann Bakeries, Inc. v. Local 776, Int'l Bhd. of Teamsters,* 969 F.2d 1436 (3d Cir.1992), *cert. denied,* 506 U.S. 1022, 113 S.Ct. 660, 121 L.Ed.2d 585 (1992); *Chrysler Motors Corp. v. Int'l Union, Allied Indus. Workers,* 959 F.2d 685 (7th Cir.1992), *cert. denied,* 506 U.S. 908, 113 S.Ct. 304, 121 L.Ed.2d 227 (1992); *Communication Workers v. Southeastern Electric Coop.,* 882 F.2d 467 (10th Cir. 1989).[12]

Petitioner argues that reinstatement of the four Grievants (Mr. Williams, Mr. Angelo Brown, Mr. Sean Brown and Mr. Kelly) violates the public policy against sexual harassment in the workplace and relies primarily upon the ruling in *Newsday, Inc. v. Long Island Typographical Union No. 915,* 915 F.2d 840 (2d Cir.1990), *cert. denied,* 499 U.S. 922, 111 S.Ct. 1314, 113 L.Ed.2d 247 (1991). In *Newsday,* a male employee had been discharged twice by Newsday, Inc. for "disorderly conduct." *Id.* at 842. The first incident, in 1983, involved "offensive and unauthorized contact" with female coworkers, and resulted in an arbitration award "sustaining the disciplinary action" of four days' suspension as "not being in violation of the parties' collective bargaining agreement." *Id.* The arbitrator stated that "any [future] action on the part of [the employee] which is consistent with this past citable behavior shall be grounds for immediate discharge and he will not be given the benefit of the doubt or shown any leniency." *Id.* at 842 (emphasis added). After the employer had reinstated the employee, the employee was again discharged in July 1988, for "disorderly conduct." A second arbitrator found that there had, in fact, been three earlier incidents between late 1983 or early 1984 to 1988, that were serious and were "of the type which Newsday … properly attempted to eliminate from its work place." *Id.* at 843. Nonetheless, the second arbitrator decided that the employee had not been discharged for just cause, and ordered him reinstated without back pay. United States District Court Judge I. Leo Glasser vacated the arbitrator's award, reasoning that the unavoidable consequence of the arbitrator's award would be to "compel his female co-workers to submit to his sexual harassment (conduct of which he has been repeatedly adjudicated) as a

11. EEOC regulations provide that "… harassment on the basis of sex is a violation of sec. 703 of Title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment …. or (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment." 29 C.F.R. § 1604.11(a) (footnote omitted). "Employers must take all necessary steps to prevent sexual harassment in the work place, such as expressing strong disapproval of the conduct and developing appropriate sanctions." *Id.* at (d) and (f).

12. In addition, the public policy against sexual harassment in the workplace is reflected in both New York State and City legislation. *See* New York State Human Rights Law, N.Y.Exec.L. § 296; Chapter I, Title 8 of the Administrative Code of the City of New York.

condition of their employment and to permit his sexual harassment to threaten to perpetuate a hostile, intimidating and offensive work environment." *Newsday, Inc. v. Long Island Typographical Union No. 915*, No. 89–3228, 1990 WL 302786 *3 (E.D.N.Y. February 6, 1990). The Court of Appeals for the Second Circuit affirmed, *Newsday*, 915 F.2d 840. Petitioner argues that the instant case "is on all fours with" *Newsday*. (Pet's Mem. at 9). The basis for the *Newsday* Court's vacatur of the arbitration award, according to Petitioner, was that "above all," the Award prevented "Newsday from carrying out its legal duty to eliminate harassment in the workplace," Petitioner urges this Court to "find that duty even greater" in this instance. (Pet'r Reply Mem. in Supp. of Pet. to Vacate ("Pet'r Reply Mem.") at 3).

Respondent argues that *Newsday* is inapposite and relies instead upon *Saint Mary Home, Inc. v. Service Employees Int'l Union, District 1199*, 116 F.3d 41 (2d Cir.1997), where an employee had been discharged by Saint Mary Home, Inc., following his arrest for assault upon a co-worker and drug possession. The employee had worked for Saint Mary Home for fourteen years without major disciplinary problems. The employee's union filed a grievance (pursuant to the grievance procedure under the collective bargaining agreement between the employer and the union). Thereafter, the union invoked the collective bargaining agreement's binding arbitration provisions.[13] The arbitrator subsequently reinstated the employee without backpay or lost benefits. The Sec-

ond Circuit, in *Saint Mary Home*, affirmed and found that the employer could not "point to an established policy that calls for a fixed disciplinary action of permanent dismissal in all cases where drug related conduct occurs in the workplace," and that "the drug policy relating to the response for drug related conduct in the workplace is flexible and remedial," *Id.* at 46.

While it is not sufficiently clear from the Award, the instant case may be distinguishable from *Newsday*, insofar as the *Newsday* employee had a history of repeat sexual offenses. Here, the Grievants' past misconduct, if any, is not spelled out by the Arbitrator. According to Judge Glasser, "a clearer expression of ... well defined public policy ... will not be ... found ... [This policy] is subverted when an employer is required to reinstate an employee who is a chronic sexual harasser and an award which has that effect should be vacated." *Newsday*, 915 F.2d at 843. *See also, Consolidated Edison v. Utility Workers' Union*, No. 95–1672, 1996 WL 374143 (S.D.N.Y. July 3, 1996) (Koeltl, J.) (vacating as contravening public policy the reinstatement of an employee who had already been issued clear warning that further sexual misconduct could lead to dismissal); *Stroehmann Bakeries, Inc.*, 969 F.2d 1436 (3d Cir.1992) (affirming as consistent with public policy a vacatur of an award reinstating employee accused of sexual harassment where arbitrator had not determined whether the harassment had actually taken place).[14]

---

**13.** The collective bargaining agreement provided, in relevant part, for the following: "1. A grievance ... which has not been resolved ... may ... be referred for arbitration by the [Saint Mary Home] or [Service Employees Int'l Union] to an arbitrator selected in accordance with the American Arbitration Association.... 4. The opinion and award of an arbitrator shall be final, conclusive and binding upon [Saint Mary Home, Inc., Service Employees Int'l Union and the [e]mployees]." *Saint Mary Home*, 116 F.3d at 43.

**14.** In *Consolidated Edison*, the employer had "discharged" an employee "for two incidents of sexual harassment" and "for violating a previous warning against improper conduct towards women coworkers which was given [in 1990] as a 'final warning' after three incidents involving female employees." No. 95–1672, 1996 WL 374143 *1. The arbitrator found that the employee's conduct represented "serious misconduct particularly in light of his being placed on notice that such behavior violated [the employer's] sexual harassment policy and continuation could result in discharge." However, the arbitrator concluded

■ *Saint Mary Home* sheds some light on the analysis of public policy. The Court in *Saint Mary Home* stated "while [the pertinent statutes and legal precedents] evince a strong public policy against the use, possession and sale of drugs, [they do] not support the narrower public policy the [employer] seeks to invoke: a policy against the reinstatement of [an] employee after a . . . suspension without pay or benefits." 116 F.3d at 46–47. Other circuits appear to be in agreement that the vacatur of an arbitrator's reinstatement award is not warranted when the discharged employee has had no history of prior misbehavior. *See Chrysler Motors Corp.*, 959 F.2d at 688 (Seventh Circuit affirming district court's affirmation of arbitration award reinstating employee who had been discharged for sexually assaulting a coworker, noting that the arbitrator "found it significant that [the employee] had not received warnings or discipline for any prior misconduct before being discharged." (citing *Newsday*)); *Communication Workers*, 882 F.2d at 468, 470 (Tenth Circuit affirming district court's confirmation of arbitration award reinstating an employee who had been discharged for sexually assaulting a customer but who had had a long tenure with the company without incident and had never received discipline for any prior misconduct). Moreover, several cases suggest that remedies short of permanent discharge maybe appropriate. *See e.g., Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 432 (7th Cir.1995) ("The employer's legal duty is thus discharged if it takes

reasonable steps to discover and rectify acts of sexual harassment of its employees"); *Swentek v. USAIR, Inc.*, 830 F.2d 552, 558 (4th Cir.1987) (pursuant to collective bargaining agreement, employer properly remedied sexual harassment by investigating, issuing "a written warning," and informing employee that "a suspension would follow another substantiated complaint about his language."); *Barrett v. Omaha National Bank*, 726 F.2d 424, 427 (8th Cir.1984) (concluding that "the district court did not err when it concluded that [the employer] took immediate and appropriate corrective action" by conducting a "full investigation," informing the co-workers accused of sexual harassment that "their conduct would not be tolerated," and informing one of them that "he would be fired for any further misconduct."); *accord Ellison v. Brady*, 924 F.2d 872 (9th Cir. 1991).

## V. Need for Additional Information: Clarification

■ The above authorities notwithstanding, the Court believes the arbitration Award is not sufficiently clear and definite, rendering it difficult to affirm or vacate the Award. On the one hand, the Arbitrator may bring "his [or her] informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies." *Misco*, 484 U.S. at 41, 108 S.Ct. 364 (quoting *United Steelworkers of*

that "discharge was too severe a sanction in light of [the employee's] forty-four years of service and the incongruity between his earlier misconduct in 1990 and the incidents at issue" and awarded "reinstatement, without back pay, on a 'last chance' basis." *Id.* at *2. Recognizing the "dominant public policy against sexual harassment in the workplace," *Id.* at *5, District Judge Koeltl vacated the arbitration award, stating that "just as the Court of Appeals held on strikingly similar facts in *Newsday*, reinstatement of [the employee], a recidivist sexual harasser who ignored an explicit warning, was contrary to public policy." *Id.* at *4. Judge Koeltl further

stated that "this is not to say that an arbitration award of reinstatement after a discharge for sexual misconduct must always be vacated as contrary to public policy." *Id.* Judge Koeltl found it important that the "prior warning put [the employee] on notice that his behavior, which the Arbitrator expressly found was sexual harassment, was prohibited and serious." *Id.* at *5. Judge Koeltl held that "reinstatement of an employee who has already been issued a strong and unambiguous warning that any further sexual misconduct could lead to dismissal would contravene the public policy condemning such behavior." *Id.*

*Am.*, 363 U.S. at 597, 80 S.Ct. 1358).[15] On the other hand, this case involves troubling behavior(s) which have no place in the modern work environment. It is, therefore, appropriate for the Court to seek clarification from the Arbitrator. *See Americas Insurance Co. v. Seagull Compania Naviera*, 774 F.2d 64 (2d Cir.1985) (Second Circuit vacating district court's judgment regarding an award containing "sufficient ambiguity," and remanding to the district court for referral back to arbitration panel for clarification). A district court "should not attempt to enforce an award that is ambiguous or indefinite." *Id.*, at 67. "An ambiguous award should be remanded to the arbitrators so that the court will know exactly what it is being asked to enforce." *Id.* (citing *Cleveland Paper Handlers and Sheet Straighteners Union No. 11 v. E.W. Scripps Co.*, 681 F.2d 457, 460 (6th Cir.1982) (per curiam); *Oil, Chemical & Atomic Workers Int'l Union, Local 4–367 v. Rohm and Haas, Texas, Inc.*, 677 F.2d 492, 495 (5th Cir.1982) (per curiam) (Appendix)).

Specifically, it is difficult for this Court to determine whether the Award contravenes the public policy against sexual harassment in the workplace without knowing precisely what factual findings support the Arbitrator's recommendation of reinstatement. *See Walter N. Yoder & Sons, Inc. v. Sheet Metal Workers' Local Union No. 100*, 661 F.Supp. 1141, 1145 (D.Md.1987) (remanding case, because of various ambiguities in the award, back to arbitration panelists for "written statements setting forth the factual predicate upon which their conclusions were based, and clarifying the meaning and effect of their decisions."). Among other things, it is unclear from Arbitrator Rappaport's decision whether: (i) she concluded the conduct of all or only some of the four Grievants whom the Arbitrator reinstated without backpay did, in fact, amount to sexual harassment within the meaning of the Employer's policy and/or created a hostile work environment; and (ii) whether Arbitrator Rappaport assessed and/or specifically found that any of the Grievants had any history of prior sexual harassment disciplinary problems. A proper resolution of the present dispute requires a remand to Arbitrator Rappaport so that she may clarify in writing the factual predicate for her findings.

## VI. *Conclusion and Order*

Accordingly, for the reasons stated herein, this case is remanded to Arbitrator Lois A. Rappaport for further clarification as to her findings. Specifically, this Court respectfully requests that Arbitrator Rappaport clarify the Award in writing on or before September 8, 2000, by responding to the following questions: 1) state the specific definition(s) of "sexual harassment" and "hostile work environment" used to measure the Grievants' behavior; 2) state the specific remedies considered for each of the Grievants; 3) state whether any of the four Grievants (Messrs. Williams, Angelo Brown, Sean Brown and Kelly) had had any prior disciplinary problems, infractions, sanctions, warnings, etc., for sexually oriented behavior in the workplace; 4) describe the behavior (in detail) of each of the Grievants which she found to be sanctionable; 5) state and explain whether the behavior(s) described in response to question 4) constitute sexual harassment; 6) state and explain whether the behavior(s) described in response to question 4), either individually or collectively, constitute (or contribute to) a "hostile work environment"; and 7) state whether and how the actions and/or behavior of Ms. Ellis may, according to the Arbitrator, have impacted the conclusions drawn as to the behavior of the Grievants.

**Resolution of the cross-motions before this Court [6–1 and 1–1] shall be stayed pending remand for clarification. The parties are directed jointly to serve**

15. Article XXXII of the CBA provides that: "The award of an arbitrator hereunder shall be final, conclusive and binding upon the Employer, the Union and the Employees."

a copy of this Order upon the Arbitrator on or before July 19, 2000.